Thank you, Your Honor. My name is John Rhodes. I'm from the Missoula office of the Federal Defenders of Montana. I represent Matthew Browne. I'll try to reserve two minutes for rebuttal. Please be informed that the time shown is your total time remaining. Thank you, Your Honor. All right. Detective Schofield did not have reasonable suspicion to seize Matthew Browne. The government and the up until the time that Sgt. Holzer exited his squad car. Excuse me. That's what the district court found, right? That was the line in the sand? Yes. Okay. And two things with respect to that. First, under the Supreme Court's decision in Rodriguez, you have to examine the mission of the traffic stop and what the officers, in fact, did to determine when the traffic stop ended and the narcotics investigation began. Here, as soon as Holzer obtained Mr. Browne's driver's license, he gave it to Detective Schofield. When does a traffic stop involve giving the driver's license to a narcotics investigation? And Sgt. Holzer admitted he didn't run the driver's license. He didn't run a wanted check, both of which are standard operating procedure when processing a traffic ticket. Sgt. Holzer admitted he was not processing a traffic ticket. He also admitted that when he was in his vehicle, the traffic stop had ended and the narcotics investigation had began. Well, he did run a registration check and I think an insurance check as well. And presumably, if he'd found something, he would have reacted to it. So I'm not sure it's factually correct to say that it was all over once the car was stopped. In his own testimony, he said that when he was in his vehicle running the registration check, the 28 it's called in the nomenclature, that the traffic stop had ended. That it was a criminal investigation. I don't understand that part because your argument seems to be that the traffic stop never started. That it was never a traffic stop. Is that really, I mean that seems to be the logical conclusion of what you're suggesting. Our position is it was a narcotics investigation from the beginning, but as soon as Holzer surrendered the driver's license to Schofield, the traffic stop ended. Okay, wait a minute, wait a minute, so forgive me. So it's not your argument that there was never a traffic stop? Yes, that's our first argument, but certainly as soon as he surrendered the driver's license, it was no longer a traffic stop. Okay, so Judge Clifton has a question. They're not, why are they mutually exclusive? Well, it's a sequence of events and at some point, as Judge Kristen said, there's got to be a demarcation. Well, wait a minute, not necessarily. They could overlap. In other words, the traffic stop could have stopped right later after the narcotics investigation already started and I don't think you've ruled out that possibility. Going to that issue, Your Honor, that's exactly what Judge Christensen ruled. That as soon as Holzer exited his vehicle, that's when the traffic stop concluded. At that point, if you look at Exhibit 503 and it's from the timestamp of about three minutes and 20 seconds to three minutes and 29 seconds, that's Holzer's body camera. He gets out of his vehicle. You can see him get out of his vehicle and you hear Detective Schofield say, hi, to Mr. Brown. So at that point, Detective Schofield had not even begun questioning Mr. Brown. So even if the district court is correct, any of the information gained from Mr. Brown by Detective Schofield was not part of the traffic stop period. That was part of the narcotics investigation. I still don't understand why it's an either-or situation. We've got mixed motives all the time. Why can't it be mixed here? As long as there was a stop going on that would have continued for traffic purposes, what's the problem? That's my latter point, Your Honor. The point I just made is when Holzer exited his vehicle, certainly then the traffic stop is over. He's done. Detective Schofield had not even begun questioning Mr. Brown yet. That interval, even if you decide that one didn't start until the other ended, that interval is it's less than two minutes. Well, it was on three minutes. Yes, Your Honor, approximately two minutes. When we synchronized the various cameras, we had less than two minutes. It's a very small interval. Do you agree with that? Yes, it's about two minutes, ballpark two minutes. So at that point, Detective Schofield had not even begun questioning Mr. Brown. And going back to Rodriguez, you have to look at what the officers in fact do to determine reasonableness. Look at what Detective Schofield did. The bottom line is he either absentmindedly, erroneously testified, or he flat-out lied. He had all sorts of details in his report and in his testimony that he said he gained from Mr. Brown that are not on the video. I think that there are some disturbing inconsistencies between that transcript, what I'll call a transcript, and the video. For purposes of later, in the sequence of events, after there's already enough indicia of reliability to corroborate the anonymous tip, what do we conclude from that? Well, you exclude them from the reasonable suspicion analysis. Exclude what? The misinformation provided by Detective Schofield, putting it generously. Right, and so I think that's right, but that would leave you with the avalanche, blue plates, in or near Kalispell on Monday or Tuesday, and the blue Chevy Avalanche with BC plates was seen in Libya. Before you tell me about the discrepancies in terms of those bullet points, I think blue Chevy Avalanche, it's a little late, it's Wednesday, not Monday or Tuesday, right? It's got the BC plates as you indicated, but the minute Schofield received the license, he also the driver's name is Matt. It seems to me that's a very powerful corroborative evidence. It's not, Your Honor. First, the location's 90 miles from Kalispell. Yeah, but we know the person's not going to sit in Kalispell. He's trying to get drugs across the border, so telling me it's far from Kalispell doesn't tell me it's not where you would expect to find him if he's trying to get to the border. Well, that's where the Supreme Court case law is important. JL talks about you have to have an assertion that not only determines a particular person, but illegality and all the blue Chevy Avalanche with BC or California plates driven by somebody named Matt is an assertion of a determinate person. It's not a determination of illegality. Corroboration, isn't it? It's not specific. That's where the Morales case from this court becomes important. Is the problem specificity or the predictive nature? It's both. It's the specific details are not corroborated. 90 miles away, three days, not a day or two later, is not corroborated. In fact, it corroborates that the tip was wrong, and it's not detailed because the specifics are wrong. Well, the tip said he was thought to be in Kalispell that day, and he's trying to get across the border, so he wouldn't stay in Kalispell. He'd be moving, and they thought it would be within the next day or two, and it turned three. That doesn't seem remarkably different to me. Why can't that serve as corroboration for the underlying key piece of the anonymous tip, which is the drug connection? So if somebody's 90 miles from here in Seattle, I don't think that's specific. Well, if you know they're going to get across the border, you're going to start looking up around Blaine. That seems to make sense to me. Then there's one set of laws in a city and another set of laws in a rural area where you're saying, oh, 90 miles is close enough. It's all reasonableness. It's all, you know, what's into account. All of that. If the mission is to get across the border with backpackers, where would you expect to find them? Would you expect to find them sitting in Kalispell? Would you expect to find them at the Border Patrol Station on the highway? Or would you expect to find them someplace headed toward a rural area? Look what law enforcement did. Agent Capser testified that they staked out Highway 93. That's a north-south. The most direct north-south route. From Kalispell. And they found him over on what is really kind of an east-west route. Yes, Libby is. But your blue brief said that he was headed north. Because it's east-west, but the road goes like this because of the geographic features. But it's an east-west route. Libby's a little bit north of Kalispell. They were staking out 93 because that's the most direct route from Kalispell north to Canada. Is that right? Yes, and also because that's what the tip said, in or near Kalispell. It didn't mention Libby. Well, but it didn't say Route 93. It didn't say anything about 93. In or near Kalispell. Right, and so there seems to me there's sort of two ways to get to Canada. One of them is a bit more roundabout. As you said, it loops down, loops south and then back up to Libby. Did they stake out Highway 2 between Kalispell and Libby or just 93? Just 93. Agent Capser said they staked out Highway 93, which is the north-south route, and by Tuesday night they were getting frustrated. They were thinking we're not going to find anything. So what is your argument about, what's the significance of the fact that they stopped him? I think he went to Libby, went to McDonald's, said he got turned around. Let me just make sure that I'm right about this. When he was stopped, he said he was coming from Kalispell. That would be corroborative? Yes, although by then the narcotics investigation had ended and there was a reasonable suspicion to begin it. But yes, that did occur. And am I right that he'd gone, he said he'd gone to McDonald's and got turned around in the parking lot? Was the McDonald's in Libby? Is that the idea? And then he turned back towards Kalispell? Yes, he headed from Libby to Kalispell, realized, then he turned around outside of Libby, back toward Libby. Okay, that was, you've answered my question about that. Okay, thank you. I've got about 14 seconds left, so I'll reserve what I have. We'll give you a minute for rebuttal. Thank you, Your Honor. You're welcome. Tim Tatarka of the District of Montana on behalf of the United States. The focus with respect to these predicted, these tip cases, is whether the extent to which there is predictive information regarding the movements of third parties such that it's likely to show that there's inside information, that the therefore be correct about the other information that they have. Here, I do think it's important to take into account that this happens in a rural area of Montana. This isn't like Alabama versus White, which dealt with a matter of a few miles within Montgomery, Alabama. This was a prediction that there was going to be a blue Chevy Avalanche with BC plates driven by a man named Matt. It said nothing about the yak, right? It said nothing about the yak. That got picked up later, sort of like by the game of gossip, and I don't mean to imply anything nefarious about that, but that was not part of the original tip, right? As described by Agent Kapser, he said that it was going to be to be backpacked across the border. It didn't specifically, there's no specific mention of the yak, but as the district court notes at page 184 and 185 of the record, there's that the yak, which is everything to the west of Lake Kukanutza there, to the Canadian border, that is the mountainous federal land. That whole area is... Is it a national forest? I don't know if all of it is national forest, but there is national forest there. I don't want to take up too much of your time, so if he had proceeded north on 93, which after all is where they were watching, would he have gone through an area that's not forested? Yes, there is not that area right around Port of Roseville is not forested. And again, as the district court noted at pages 184 and 185, there's two ways to get to the yak. One of them is to go up 93... My point is just that the yak was not part of the anonymous tip, and I haven't heard you concede that point. Am I wrong on that point? There's no evidence that the word yak was used in the tip. However, as Agent Schofield testified at page 63 of the record, that area is... was a known area for the trafficking of drugs across the border. I understand. And... Okay. What about the very... What I have described, these are my words, disturbing inconsistencies, but what is on the record and what was testified to about what the defendant said while he was waiting in the car? I don't... There is, at page 172 of the record, Agent Schofield acknowledges that he had got the timing wrong with respect to that, or the sequence wrong with respect to that conversation about the hunting, Mr. Brown's hunting activities. It's not just sequence, counsel. There's a... You've read it, I'm sure. It's not just the sequence. There's a significant detail in the testimony that doesn't appear in the recording, right? Oh, oh, I'm sorry. I was talking about... There was a mistake in the... in the report about the sequence. There was... there was undoubtedly additional testimony that wasn't in the report, and I would note that the District Court found that testimony to be credible, and that credibility determinations are the area... Disturbing inconsistencies. There are additional detail added. I don't think so, Your Honor, and I don't think the District Court thought so, and that is an area where the District Court is entitled to deference. Go ahead. We've had the record here, so there's not a lot to... Go ahead. And I do think that some of those are exaggerations. I would point... I would recommend the testimony where Defense Counsel indicates that Detective Schofield was erroneous in the list of states where Mr. Brown had visited. I think, and the Court can judge for itself, I think that testimony doesn't indicate that he was... indicating that Mr. Brown was in those states. I think he correctly identifies the path that Mr. Brown took, and then in articulating the fact that he... But what about the hunting in Canada, and the discussion of where he hunted, and the size of the deer, and all of that conversation? That conversation happened. He did get that information. He didn't get that information before he had the sequence wrong. He didn't have that information before the tip is in there, and he acknowledges that at page 172 of the record, and the District Court didn't rely on that information. Okay, so let me put it this way. If I think there are... If I conclude that there are disturbing inconsistencies there, what am I supposed to do with that? That conversation, the conversation that I find disturbing, happened after, you know, sort of late in the sequence. So what do we do with that? There's corroborative, some corroborative information, and then some information that tended to contradict the tip. I disagree that there was information that contradicted the tip, but I... Okay, so for example, they were expecting him to come out of Kalispell and head towards Canada, and they were staking out 93, which is the logical route to Canada, and they found him over in Libby West, where they didn't expect... And he's two days, I'm going to say, roughly two days late, and I mean, as you know, there are some things that weren't consistent. So what about those points? The Supreme Court addressed a similar issue in Illinois versus Gates, particularly at footnote 14. There, the tip involved people traveling back and forth to Florida, and the wife flew down rather than drove down, or perhaps vice versa. The court expressly said that courts don't ask government informants to be infallible, and that that information is taken into consideration in the totality of the circumstances. And to answer your broader question, that would be my answer. So is this just a weighing? Is that your position? And as Wren notes, this is about objectively what there is probable cause to believe. The fact that Detective Schofield got some facts wrong in his report doesn't change the objective factors, objective corroboration that there was of the tip. And I would also point out that this case is different than some of the other cases where the stop relied entirely on the external information of the tip. Unlike Morales or J.L. or even Alabama versus White, here there was a valid traffic stop, which allowed two things to happen. But did anything, was anything gleaned from that stop? I mean, it seems like the narcotics investigation rests primarily, almost entirely, I think, on the tip and its partial corroboration. There wasn't anything obtained from the traffic stop that was useful, was there? I think there was two important things that happened in just the first moments of that traffic stop. Most importantly, the corroboration of the name, which is the key. That's the strongest fact we've got. I mean, what percentage of the population are Matthews? So you got that. Yeah. And then the other thing that I think is really important in this case was the testimony of both officers, both Officer Holzer and Detective Schofield, at pages 100 and 142 of the record, about the nervousness of Mr. Brown. This isn't a case... Is that reflected at all in the recording? I mean, my recollection is that it really wasn't. And so it's not to say the testimony is wrong, but if there was nervousness or shaking, it may not have been as dramatic as all that. Well, Mr. Brown's hands are not visible really the entire time on the video, so there's no question one way or the other. The video can't contradict or corroborate that as far as whether his pulse was pounding his neck. To be honest, I shake when I'm stopped by a cop too, so it's kind of a nervous situation. It is, but I do think there's a difference here between a garden variety traffic stop... And you're driving a truck filled with stuff. You have to make a large inferential leaf. He's nervous because he's doing illegal activity. The illegal activity is drugs, whereas here they already had a significant amount of information to believe that this vehicle was carrying drugs. The fact that Matt driving that vehicle was also unusually nervous is corroboration and certainly supports reasonable suspicion to extend the stop for the dog sniff, unless the Court has any further questions. It appears not. Thank you, counsel. One minute for rebuttal. Thank you, Your Honor. At ER 140, Detective Schofield said he, referring to Mr. Brown, went through Utah, Oregon, and Idaho. He never said that. He said he went through Oregon. That's what Mr. Brown said. He never said Utah or Idaho. On this nervous issue, Mr. Brown's on the video for something like 40 minutes. There's no demonstration of nervousness. Also, with respect to the government claiming now it was unusual, there's no testimony from the law enforcement officers that his nervousness, his behavior was unusual. His throat is visible on the video. It's never seen to pulsate. And again, when he's sitting there, law enforcement's swarming in, and it's not true that his hands are never visible. He does hand the documents to Sergeant Holzer, see if they're shaking when he hands the documents to Sergeant Holzer. Counsel, my notes show that Schofield testified that Brown, quote, made comments about a big deer being 75 pounds. He asked Brown how many bucks Brown had killed. Brown said the biggest buck is like a six-point buck on its head, which the comments made no sense whatsoever, close quote, ER 142. Am I wrong that there's not corroboration for that testimony? He said that happened during his initial questioning of Mr. Brown and that he based his reasonable suspicion on that baffling information. That's the part I know. What I'm asking is whether or not there is. I cannot find corroboration for that testimony. It seems to be at odds with the record. Am I wrong about that? It may have come out later. I'm not sure about each specific detail. What happened was Sergeant Holzer went to talk to Mr. Brown while they were waiting for the K-9 unit, which was coming from Bonner's Ferry. So some of that information may have been provided later, but it was not provided during the initial approximate four-minute questioning Schofield did of Mr. Brown. In terms of the specificity, I would just point to this case in Morales where there were far more details, far more predictive information, and the court ruled that it was not reasonable suspicion. And in particular, I would note that the vehicle was stopped in Alberton, which is about 25 miles west of Missoula, and the court, in part of its ruling, said that doesn't mean the vehicle is going to Missoula. Finally, with respect to this idea that there's one reasonable suspicion standard to determine whether a traffic stop can be made and another reasonable suspicion standard for whether there's a narcotics investigation, that's not right. That idea was rejected in J.L. that we're going to have one reasonable suspicion standard if there's a gun involved and another for everything else. It was recently rejected by the Supreme Court in Navarrete. It's a single standard, and the government and the district court are trying to distinguish Morales, perhaps Alabama v. White, by saying the reasonable suspicion was established prior to the stop, not anything gained during the stop. Here, we don't think anything was gained other than perhaps Mr. Brown's name. But this idea that there's a fluid standard is clearly rejected by the courts, this court and the Supreme Court's case law. All right, thank you, counsel. Thank you to both counsel for your helpful arguments in this case. The case just argued is submitted for decision by the court. The next case on calendar for argument is Sampson v. Gelwind, Inc.
judges: Rawlinson, Clifton, Christen